SECOND DIVISION
 May 27, 1997

No. 1-96-0518

In re R.M., a Minor ) Appeal from the
(The People of the State of Illinois, ) Circuit Court of
 Appellee, ) Cook County.
 v. )
 )
Tara Smith, ) 
 )
 Intervenor-Appellant )
 )
(The Department of Children and Family ) Honorable
Services, ) Sebastian Patti,
 Appellant)). ) Judge Presiding.

 JUSTICE McNULTY delivered the opinion of the court:

 Intervenor Tara Smith and the Illinois Department of Children
and Family Services (DCFS) appeal from a juvenile court order
granting the guardian ad litem's (GAL's) motion that the minor
child, R.M., be removed from Smith's foster care and placed with
foster parents Kent and Pamela Lawton. Both Smith and DCFS claim on
appeal that the juvenile court acted outside its statutory
authority when it entered an order removing R.M. from Smith's home
and requiring that R.M. be placed with a specific foster parent. 
Smith and DCFS also claim that the court's decision was in error
since the GAL failed to exhaust the administrative remedies on
behalf of R.M. prior to seeking judicial review of the foster care
placement decision that had been made by DCFS. In addition, Smith
asserts that she was deprived of her right to notice and an
opportunity to be heard when the juvenile court ruled on the GAL's
motion to remove R.M. from her home. We vacate the trial court
order removing R.M. from Smith's home and placing her in the care
of the Lawtons.
 On August 25, 1993, the State's Attorney filed a petition for
adjudication of wardship in the juvenile court on behalf on R.M.,
alleging that, due to her parent's neglect, R.M. suffered from
nonorganic failure to thrive. R.M. was born on September 28, 1990,
and she has received regular treatment since infancy for nonorganic
failure to thrive, which is malnutrition caused by multisystematic
problems, including the child's environment and family
interactions. 
 The juvenile court appointed the guardian administrator for
DCFS as temporary guardian and custodian of R.M. and Patrick
Murphy, the Cook County public guardian, as guardian ad litem. 
DCFS placed R.M. with her maternal grandmother. On November 15,
1993, the juvenile court entered an adjudication order finding R.M
abused and neglected. DCFS removed R.M. from her grandmother's
home in November 1993 and, in December 1993, placed her in the home
of Tara Smith. On February 7, 1994, the juvenile court entered an
order adjudicating R.M. to be a ward of the court and awarding the
guardian administrator for DCFS the right to place the child. R.M.
remained in Smith's custody. 
 In February 1995, R.M. was hospitalized for nonorganic failure
to thrive. She had been hospitalized once before, while living
with her parents, for nonorganic failure to thrive, and she gained
weight while hospitalized. When R.M. was hospitalized the second
time for two weeks, she gained six ounces. In the four months
prior to her hospitalization, while in Smith's care, R.M gained
three ounces. When R.M. was released from the hospital she
returned to Smith's care. 
 LaRabida Hospital has of policy of reporting to DCFS cases
where a child gains weight in the hospital, since this is evidence
of nonorganic failure to thrive. Therefore, someone on the
hospital staff called in a report to the DCFS hotline regarding
R.M. The DCFS Division of Child Protection (DCP) investigated the
hotline report and in early April 1995, R.M. was removed from
Smith s care by the Lutheran Social Services of Illinois (LSSI),
the private agency handling R.M. s case, and placed her in the home
of Pamela and Kent Lawton. 
 On April 6, 1995, Smith filed a service appeal challenging
R.M. s removal from her home and seeking an emergency review of the
basis for the removal. On May 22, 1995, an independent hearing
officer from DCFS conducted an emergency review to consider Smith s
request for the immediate return of R.M. As a result of this
hearing, the DCFS hearing officer issued an interim decision on
June 1, 1995, finding that there was no risk of imminent harm to
R.M. if she were to return to Smith s home. On June 12, 1995, DCFS
returned R.M. to Smith s home. DCFS conducted an optional
mediation as part of the service appeal process on June 15, 1995. 
The placement issue was not resolved in this mediation session. 
 On June 19, 1995, R.M. s court-appointed GAL filed with the
court an "Emergency Motion to Change Placement," claiming that it
was not in R.M. s best interest to be placed in Smith s home. No
party at the hearing on this motion apprised the juvenile court of
Smith s pending service appeal. Three witnesses testified at the
hearing, Madeline Shalowitz, Ida Mabry, and Ezillia Bell. Madeline
Shalowitz, who is in charge of the Failure to Thrive Clinic at
LaRabida Hospital, testified that she has been responsible for
R.M.'s pediatric care for over two years. Dr. Shalowitz testified
that the clinic required Smith to bring R.M. to the hospital at
least once a month. However, Smith failed to bring R.M. to the
hospital for four months and R.M. gained little weight during that
time. Dr. Shalowitz testified that R.M. gained weight when she was
hospitalized and was returned to Smith s home under a 60-day
contract, which described specifically what R.M. should eat and how
much weight she was expected to gain. Dr. Shalowitz testified that
within two weeks after being discharged from the hospital, R.M.
lost the weight she had gained while in the hospital. During the
two months R.M. was in the Lawtons' home, however, she gained
weight and looked healthier. Dr. Shalowitz recommended that R.M.
stay with the Lawtons. According to Dr. Shalowitz, Smith's home is
not appropriate for R.M. since Smith failed to follow the clinic's
instructions for caring for R.M. Dr. Shalowitz testified that
keeping R.M. out of Smith's home is an emergency matter. 
 Ida Mabry, a nurse at LaRabida Hospital, testified that she
conducted a home visit to Smith's home in March 1995, to see R.M.
and deliver the 60-day contract to Smith. At 3:30 or 4 p.m., R.M.
was eating hot dogs and potato chips, but Smith was not at the
table with R.M., as the clinic had recommended. Smith told Mabry
that she leaves Pediasure, an enriched caloric drink recommended by
the hospital, out so that R.M. can get it whenever she wants. 
Mabry testified that she explained to Smith that in order to get
R.M. to drink Pediasure, Smith must sit down with R.M. and
encourage her to do so. Mabry gave Smith and the Lawtons' the same
instructions on feeding techniques that should be used to encourage
R.M. to eat. Mabry visited the Lawtons and was pleased to see that
R.M. looked healthy and had put on weight. Mabry found Smith's
home to be an inappropriate placement for R.M. and recommended that
she stay with the Lawtons rather than Smith. 
 Ezillia Bell, the program director at LSSI, testified that she
believed that R.M. should remain with Smith because R.M. has been
well cared for while in Smith's home. Bell testified that R.M. did
not gain weight while at Smith's home because Smith was not given
adequate instructions on how to care for R.M. 
 At the conclusion of the hearing, the trial court found that
it was not in R.M.'s best interest to remain in Smith's home. The
court's decision was based on the fact that R.M. failed to thrive
in Smith's home, but did gain weight while in the hospital and
while in the Lawtons' home. The court ordered that R.M. be removed
from Smith's home and placed in the Lawtons' home.
 On July 18, 1995, Smith filed a motion to intervene and a
motion to reconsider. On October 23, 1995, the juvenile court
judge granted Smith s motion to intervene. On November 29, 1995,
Smith filed a motion to vacate the order removing R.M. from her
home and placing her with the Lawtons. Smith presented to the
court the affidavit of Dr. Aleta Clark, who determined that R.M.
had gained sufficient weight while in Smith s care. The trial
court denied Smith s motion to reconsider. The court found that
Smith did not have standing or intervenor status for the purposes
of the court's emergency hearing, and that the decision to remove
R.M. from Smith's home was proper in order to prevent R.M. from
imminent harm.
 Smith and DFCS filed separate appeals. Both Smith and DCFS
claim that the juvenile court acted outside its statutory authority
when it entered the order requiring that R.M. be removed from
Smith's home and placed with a specific foster home, the Lawtons. 
 On April 3, 1996, either DCFS or LSSI removed R.M. from the
Lawtons' home and placed her in the home of other nonrelative
foster parents, the Jeters. In light of this development, the GAL
claims that DCFS's and Smith's challenge to the trial court's
authority to place R.M. with a specific foster home, the Lawtons,
is moot. An issue on appeal becomes moot when events occur after
the filing of the appeal that make it impossible for the appellate
court to grant the complaining party effectual relief. Mount
Carmel High School v. Illinois High School Ass'n, 279 Ill. App. 3d
122, 664 N.E.2d 252 (1996); In re A Minor, 127 Ill. 2d 247, 537
N.E.2d 292 (1989). 
 However, a case that normally would be considered moot may
qualify for review if it involves a question of great public
interest. In re A Minor, 127 Ill. 2d 247, 537 N.E.2d 292 (1989). 
The criteria for the public interest exception are: (1) the public
nature of the question; (2) the desirability of an authoritative
determination for the purpose of guiding public officers; and (3)
the likelihood that the question will generally recur. Minor, 127
Ill. 2d at 257. We find the public interest exception
applicable here since the issue of whether the juvenile court may
order that a child be removed from one foster home and placed in
another is an issue of public concern. Furthermore, it is
desirable that juvenile court judges receive guidance as to the
circumstances under which they may make specific placement
decisions. It is also likely that this issue will recur. We
therefore address the issue of whether the juvenile court had
authority to order that R.M. be placed with a specific parent as
well as whether the court had authority to order that R.M. be
removed from Smith's home. 
 The GAL concedes that the juvenile court did not have the
authority to order R.M.'s specific placement with the Lawton's. 
The juvenile court's authority is defined and limited by the
Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 (West 1994)). 
In re M.M., 156 Ill. 2d 53, 619 N.E.2d 702 (1993). The juvenile
court is authorized under the Act to enter an order requiring a
guardian or custodian to place a child in a specific foster home in
only one circumstance; when an application to restore a minor to a
parent, guardian or legal custodian has been filed, then foster
parents may intervene in the proceeding for the sole purpose of
requesting that the minor be placed in their care. 705 ILCS 405/1-
5(2)(b)(West 1994). That section of the Act further clarifies:
 "The juvenile court may only enter orders placing a minor
 with a specific foster parent under this [Section] and
 nothing in this Section shall be construed to confer any
 jurisdiction or authority on the juvenile court to issue any
 other orders requiring the appointed guardian or custodian
 of a minor to place the minor in a designated foster home or
 facility." 705 ILCS 405/1-5(2)(b)(West 1994). 
 This section is clearly not applicable here. 
 In all other instances, once the court chooses to place a
 child with DCFS, the Act does not permit the court to then order
 DCFS to place the child in any specific setting. 705 ILCS 405/2-
 23(3), and 2-28(2)(West 1994); In re M.V., Nos. 1-96-3289 & 1-96-
 3324 (May 2, 1997) (the court has authority only under section 1-
 5-(2)(6) to order a specific placement); In re T.L.C., 285 Ill.
 App. 3d 922 (1996)(court concluded that when guardianship is
 placed with DCFS, there is no statutory authority permitting the
 court to dictate to DCFS exactly where custody must be placed); In
 re Chiara C., 279 Ill. App. 3d 761, 665 N.E.2d 404 (1996)(the
 court found that the circuit court orders requiring DCFS to place
 minor in specific residential and educational services are in
 violation of the Juvenile Court Act). 
 We now turn to the issue of whether the juvenile court had
 authority to grant the GAL's emergency motion to change R.M.'s
 placement and order R.M. s immediate removal from Smith s home. 
 DCFS has established an administrative review and appeals process
 for children and families who request or receive child welfare
 services from DFCS. 20 ILCS 505/5(o)(1994). Foster parents and
 children receiving services may appeal decisions regarding
 placement of a minor pursuant to section 5(o) of the Children and
 Family Services Act (20 ILCS 505/5(o) (West 1994)). 89 Ill. Adm.
 Code 337.60 (1994). Section 5(o) provides that "[a]n appeal of
 a decision concerning a change in the placement of a child shall
 be conducted in an expedited manner." 20 ILCS 505/5(o)(West
 1994). 
 The service appeal process consists of an emergency review,
 optional mediation, a fair hearing, and a final administrative
 decision. 89 Ill. Adm. Code, 337.30 (1994). An emergency review
 allows for an interim decision pending a fair hearing, and such
 emergency decisions are made within 10 days of the date that
 emergency review was requested. 89 Ill. Adm. Code
 337.30(b)(1994). Mediation is offered within 30 days of the date
 the service appeal was filed. 89 Ill. Adm. Code 337.30 (1994).
 If the dispute is not resolved in mediation, then an
 administrative law judge conducts a fair hearing where all parties
 may present evidence supporting their positions. 89 Ill. Adm.
 Code 337.30(c)(1994). Following the hearing, the administrative
 law judge makes a recommendation to the Director of DCFS. The
 burden of proof is on DCFS to show that the decision was made in
 the best interest of the child. The Director of DCFS issues the
 final administrative decision. 89 Ill. Adm. Code 337.20 (1994). 
 Any party to the service appeal proceeding may seek judicial
 review of DCFS s final administrative decision under the
 Administrative Review Law (20 ILCS 505/9.9 (West 1994)). 
 In the instant case, Smith initiated a service appeal on
 April 6, 1995, after R.M. was removed from her care. On May 22,
 1995, an emergency hearing was held by DCFS authorities to
 consider Smith's request for the immediate return of R.M. On June
 1, 1995, a hearing officer issued an interim decision determining
 that there was no risk of imminent harm to R.M. if she were
 returned to Smith s home until the service appeal process was
 completed. On June 12, 1995, DCFS returned R.M. to Smith s home. 
 The GAL participated in the service appeal process and even
 attended mediation on the issue of R.M.'s foster placement on June
 15, 1995. The mediation was then to be followed by a formal
 hearing, which was to be held in a expedited manner. Rather than
 complete the service appeal process, the GAL filed this emergency
 motion to change placement on June 19, 1995. 
 Under the circumstances here, the juvenile court had no
 authority under the Act to conduct an emergency hearing to change
 placement and order R.M.'s removal from Smith's home. Had there
 been an immediate and urgent necessity to remove R.M. from Smith's
 care, the juvenile court could have removed R.M. from such a
 dangerous placement by holding a temporary/shelter care hearing
 pursuant to section 2-10 of the Act. 705 ILCS 405/2-10 (West
 1994). This section authorizes the juvenile court to remove a
 child from a placement if it finds probable cause to believe it is
 a matter of urgent or immediate necessity for the protection of
 the child. The GAL, however, does not claim that it was an urgent
 and immediate necessity to remove R.M. from Smith's home and
 certainly the evidence does not support such a finding. 
 Dr. Shalowitz testified that Smith s home was not an
 appropriate placement for R.M. and that it was best for her long-
 term development that she be removed from Smith s home as soon as
 possible. Dr. Shalowitz testified that keeping R.M. out of
 Smith's home is an emergency matter. However, Dr. Shalowitz
 obviously did not believe that R.M.'s removal from Smith's home
 was an immediate and urgent necessity since she had recommended
 that R.M. remain in Smith s home for 60 days after her release
 from the hospital in order to give Smith another chance to 
 properly care for R.M. R.M was released from the hospital on
 March 13, 1995, and was removed from Smith's home on April 3,
 1995. Therefore, Smith was never given an opportunity to
 implement the feeding techniques recommended in the 60-day
 contract. The record reveals that R.M. gained twice as much
 weight during her two-week stay in the hospital as she had during
 the prior four months in Smith's care and that, two weeks after
 her release from the hospital, she lost the weight she had gained
 in the hospital. R.M. gained only three ounces in the four months
 prior to hospitalization; however, she gained six ounces in the
 hospital while on a high caloric drink, but she lost this weight
 two weeks later. The loss of a few ounces does not indicate an
 immediate or urgent necessity that R.M. be removed from Smith's
 home. Rather, the GAL could have completed the service appeal
 process without putting R.M. in any immediate danger. 
 The GAL next claims that the juvenile court had authority to
 conduct a permanency review hearing and determine whether R.M.
 should be removed from Smith's home. Section 1-3(11.2) of the Act
 (705 ILCS 405/1-3(11.2)(West 1994)) defines a permanency review
 hearing as one in which the juvenile court conducts a hearing to
 review and determine the appropriateness of the permanency goal in
 light of the permanency alternatives and the appropriateness of
 the plan to achieve the goal. The GAL relies on In re Chiara C.,
 279 Ill. App. 3d 761, 665 N.E.2d 404 (1996), in support of his
 claim that the hearing here, although not called a permanency
 review hearing, was in fact such a hearing. In Chiara, the court
 found that the juvenile court proceeding was the equivalent of a
 permanency review hearing since its purpose was to determine the
 appropriateness of the minor's residence and educational services.
 However, the emergency hearing to determine whether R.M.
 should be removed from Smith's home was not a hearing to determine
 the appropriateness of the long-term plans and goals that had been
 set for R.M. Rather, R.M. was placed with Smith temporarily until
 a fair hearing could be held under the service appeal process to
 determine what placement was in R.M.'s best interests. Therefore,
 this hearing, conducted on an emergency basis, cannot be
 considered a permanency review hearing. 
 Furthermore, even if the juvenile court proceedings could be
 considered a permanency review hearing, only where the court has
 found an abuse of discretion may the court order DCFS to change
 the permanency goal. Section 2-28 of the Act provides: "In
 reviewing the permanency goal *** the standard of review to be
 employed by the court shall be whether [DCFS], in setting the
 permanency goal and the service plan, abused its discretion in
 light of the best interests of the child, the permanency
 alternatives, and the facts in the individual case." 705 ILCS
 405/2-28(2) (West Supp. 1995). The trial court here did not apply
 the abuse of discretion standard, but instead determined that the
 placement of R.M. in Smith's home was not in R.M.'s best interest. 
 We therefore do not find any statutory authority permitted
 the juvenile court to order R.M.'s removal from Smith's home. The
 GAL s action was simply an attempt to circumvent the
 administrative service appeal process. The trial court's order
 removing R.M. from Smith's home and placing her in the Lawtons'
 home is therefore vacated. In light of our decision, we need not
 address DCFS and Smith's claims that the GAL failed to exhaust his
 administrative remedies, nor need we address Smith's claim that
 the juvenile court deprived her of her right to notice and an
 opportunity to be heard when it ruled on the GAL's motion. 
 Vacated. 
 RAKOWSKI and TULLY, JJ., concur.